**LAWRENCE CARTY, et al., Plaintiffs**
**v.**
**JOHN DEJONGH, et al., Defendants**

Civil No. 94-78

District Court of the Virgin Islands

Division of St. Thomas and St. John

February 27, 2007

BROTMAN, *United States District Judge.*

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

(February 27, 2007)

## I. FINDINGS OF FACT

### A. Background

1. The plaintiff class in this case filed a class action complaint and preliminary injunction motion on June 20, 1994, challenging inhumane and dangerous conditions at the Criminal Justice Complex (CJC) and CJC Annex in St. Thomas, United States Virgin Islands. Named as defendants were the Governor, Attorney General, the Director of the Bureau of Corrections (BOC), and the warden and assistant warden at the CJC, among others. The parties signed a Settlement Agreement ("Agreement") on October 12, 1994, which was entered as an Order by this Court on December 7, 1994. The Agreement requires Defendants to make specific improvements by dates certain to many aspects of operations and conditions at the CJC. Since entering the Agreement, the Court has issued a number of remedial orders requiring the Defendants to make additional improvements at the jail.

2. The Court has held the Defendants in contempt of the Settlement Agreement and its remedial orders three times. In 1997, the Court found that "[t]he conditions of confinement at the CJC also continue to fall far short of very basic, minimum habitability ... [and] defendants have not made adequate efforts to remedy the critical issues they must face, both under orders of the court and according to the agreement to which they bound themselves." *Carty v. Farrelly*, 957 F. Supp. 727, 743 (D.V.I. 1997) (*"Carty I"*). In 2001, the Court again held Defendants in contempt of the Settlement Agreement and remedial orders in the areas of a) shelter, physical plant, and environmental health; b) preventive maintenance; c) hygiene items; d) mattresses; e) fire safety; f) medication distribution; g) legal access; i) telephones; j) security systems; and k) Annex construction. See *Carty v. Turnbull*, 144 F. Supp. 2d 395, 399-416 (D.V.I. 2001) (*"Carty II"*).

3. As a contempt sanction, the Court ordered the Defendants to establish a remedial account and to deposit in it all monies received by the Government from the U.S. Marshal's Service for the housing of federal detainees in BOC facilities. *See* Order, Oct. 29, 2001. Disbursements from this account are limited to BOC operations, "with priority

803

given to expenditures mandated by all consent decrees, orders, judgments, and settlement agreements addressing conditions at Bureau of Corrections' facilities." *Id.* at 2.

4. In 2003, the Court again found Defendants in contempt of a host of provisions of the Agreement and remedial orders. *See Carty v. Turnbull*, Civil No. 94-78 (D.V.I. May 28, 2003) (Findings of Fact and Conclusions of Law on Contempt Motion) ("*Carty III*"). The Defendants remain under this contempt citation.

5. Over the past two years, the Court and the parties have focused upon mental health services at the jail. In April 2005, Jeffrey Metzner, M.D., a forensic psychiatrist who is an expert in correctional mental health care systems, toured the jail and issued a report. Dr. Metzner concluded that the jail failed to provide adequate mental health services to seriously ill CJC prisoners. See Ex. 2, Apr. 14, 2005 hearing, Apr. 14, 2005 hearing tr. at 6:23-24, (April 7, 2005 report by Jeffrey Metzner, M.D. ("April 2005 Metzner Report")). Among his findings, Dr. Metzner reported that the jail did not have a set of mental health care policies and procedures or established health care leadership, that the mental health intake screening and discharge processes were inadequate, that the medical charts were disorganized, that seriously mentally ill prisoners were not timely seen and treated, that the psychiatrist's contracted hours were inadequate, that the designated mental health unit was dangerously understaffed and overcrowded, and that the Defendants had failed to take basic steps to staff and open the forensic facility under construction at Anna's Hope, St. Croix. *See id.* at 21-22. The Defendants stipulated to Dr. Metzner's findings and agreed to implement the recommendations in his report. (Apr. 14, 2005 hearing tr. at 5:4-23).

6. On January 10, 2006, the Court held a status hearing that addressed the Defendants' efforts to implement Dr. Metzner's recommendations. Following the hearing, the Court issued a remedial order. Among its provisions, the Order requires the Defendants to transfer four prisoners adjudged not guilty by reason of insanity (NGRI) from the Golden Grove Adult Correctional Facility (ACF) in St. Croix to a psychiatric unit. *See* Mar. 22, 2006 Order ¶ 10. The Order also requires the Defendants to transfer to an appropriate psychiatric facility Jonathan Ramos, a seriously mentally ill pre-trial detainee who has been housed at the CJC for close to five years. *See id.* ¶ 11. Finally, the Order requires the Government to hire medical staff, draft policies, and purchase

equipment for the CJC Annex, which was closed at the time of the Order; and requires the Government to hire a health care records clerk. *Id.* ¶¶ 1, 3, and 5.

7. In April 2006, Dr. Metzner conducted another tour of the CJC, and has issued his report. *See* Ex. A, Declaration of Eric Balaban in Support of Contempt Motion ("Balaban Decl.") (May 15, 2006 report by Jeffrey Metzner, M.D. ("May 2006 Metzner Report")). He found that Defendants had made little or no improvements in mental health services at the CJC since his 2005 tour. As a result, seriously mentally ill prisoners continue to deteriorate at the jail. Defendants stipulated to Dr. Metzner's findings, and agreed to implement the recommendations in his Report, which this Court incorporated into its November 20, 2006 Order. *See* Nov. 20, 2006 Order ¶ 1.

8. Based on Dr. Metzner's report, the stipulation of the parties, and the record in this case, this Court makes the following Findings of Fact:

## B. NGRI Transfers

9. In 1997 and 2001, this Court held Defendants in contempt of the Mental Health Referrals, Hospitalization, and Housing provisions of the Agreement.[1] *See Carty I*, 957 F. Supp. at 739 & n.20 (finding that acutely mentally ill prisoners were not appropriately housed and treated at the CJC, and that prisoners in need of hospitalization were not transferred to the Roy L. Schneider Hospital, since the hospital's mental health unit did not maintain beds for the sole use of prisoners); *Carty II*, 144 F. Supp. 2d at 417 (concluding that under Virgin Islands law "[t]he Government has the power ... to encourage, if not direct, the expansion of mental health care services in the Virgin Islands [hospitals and] still ha[s] the option of contracting with an existing facility or constructing a new one to house mentally ill inmates.").

10. In 2001, the Virgin Islands Code was amended to allow the territorial court to remand persons who have been found not guilty by

---

[1] The Agreement required Defendants by January 1, 1996 to refer prisoners in need of emergency mental health intervention to the St. Thomas Hospital or local Community Mental Health (CMH) Center. Agreement ¶ V.2. The Agreement further required Defendants by November 1, 1994 to make hospital beds at the Roy L. Schneider Hospital available to inmates requiring hospitalization. Agreement ¶ V. 6. By December 1, 1994, Defendants also were required to establish mental health cells for prisoners in need of restraints, seclusion, or observation. Agreement ¶ V.5.

reason of insanity (NGRI) to a "certified forensic unit," or to the custody of the Bureau of Corrections if no such unit exists, where they may remain under a physician's care "until the necessary arrangements to transfer the defendant to a certified forensic unit outside the territory [are made]." *See* 5 V.I. CODE ANN. § 3637 (2002).

11. By the time the commitment law was amended, three CJC prisoners had been declared NGRI. Defendants considered transferring these men to a forensic facility in the United States, but rejected this option because of expense. *See Carty III,* slip op. at 61. These NGRI patients remained housed at the CJC during 2001, where they continued to receive substandard care. (Oct. 29, 2001 hearing tr. at 64:18-22, 65:6-11 (Braslow)).

12. By 2003, one more CJC prisoner had been declared NGRI in his criminal trial. *See* May 2006 Metzner Report II, App. I at 18-25. A court-appointed psychiatrist wrote in his post-judgment report to the territorial court that this NGRI patient "should remain in a locked, safe forensic psychiatric facility receiving state-of-the-art anti-psychotic medication for at least one year." (Dec. 3, 2003 hearing tr. at 18:13:17 (Braslow)). However, this patient and the other three NGRI patients were transferred from the CJC to ACF by late 2003. At least three of these men were moved to ACF with no prior notice to the prison's mental health counselor or psychiatrist. *See* May 2006 Metzner Report, App. I at 18 (Inmate 11), 20 (Inmate 12), 22 (Inmate 13).[2] At intake, the ACF counselor indicated that she was "at a loss of what to do" regarding the treatment of these prisoners. *Id.*

13. In June 2003, Charles Braslow, M.D., an expert in correctional medicine and the former director of Rikers Montefiore (NY) Medical Center, the health care facility for the New York City jail system, reviewed the four NGRI prisoners' care at ACF. He concluded that they remained at the prison essentially untreated. (June 6, 2003 hearing tr. at 4:13-8:25 (Braslow)). He also testified that had these men been prisoners in New York City jails, they would have been moved immediately to a forensic facility after they were declared NGRI. (*Id.* at 9:1-19 (Braslow)).

---

[2] The NGRI patients are referred to by the inmate numbers that Dr. Metzner uses in his May 2006 Report.

14. At a December 2003 contempt hearing, Dr. Braslow again testified that the NGRI patients were receiving grossly inadequate mental health care at ACF. (Dec. 3, 2003 hearing tr. at 16:5-19:25 (Braslow)). At the close of Dr. Braslow's testimony, the Court commented that the "Government is killing—is killing persons assigned for mental health reasons and not assigned by virtue of the system to the, say, Golden Grove and nothing is done with them, the Government is killing them[.]" (*Id.* at 30:1-5).

15. Through 2004, Olaf Hendricks, the BOC's Medical Director and the ACF's lone psychiatrist, repeatedly urged the BOC to transfer these men from the prison to an appropriate forensic facility. In June 2003, he wrote the following in Inmate 13's medical record:

> This is the case of a thirty-two-year-old man who was ordered to be transferred to this facility without proper professional communications and in a manner that arguably does more harm than good. The patient is psychotic and apparently has been so for a long time. He is presently on antipsychotic meds and has not had any acute exacerbation of his illness.
>
> I'm at a lost [sic] as to why the patients are remanded to this institution when there is knowledge that the fantasied forensic unit is nowhere near a reality. I must document my serious concerns about remanding individuals who are not convicted nor convictable to a prison where he spends over 20 hours daily in his cell. This is not sound medical practice.

(Dec. 3, 2003 hearing tr. at 16:25-17:24 (Braslow)). For Inmate 12, he wrote "[p]atient again for some reason is remanded to this facility without being convicted. This patient needs to be placed in a forensic facility—not here at ACF." Ex. B, Balaban Decl. (Charles A. Braslow, M.D., "Report on Health Care Services at the Criminal Justice Complex Jail, St. Thomas, United States Virgin Islands, Feb. 24, 2004"), at 11.

16. In December 2003, the Attorney General told the Court that the Government had been negotiating with Puerto Rican officials to transfer the four NGRI prisoners to a forensic facility that housed chronically mentally ill Virgin Islanders under a contract with the Virgin Islands Department of Human Services. (Dec. 3, 2003 hearing tr. at 36:12-23,

807

39:6-18 (Stridiron)). The Government had failed to complete an amended contract to house the NGRIs at that facility in the nine months since it had begun negotiations. (*Id.* at 43:9-23 (Braslow)).

17. By July 19, 2004, the Government still had failed to transfer the four NGRI patients to the Puerto Rico facility. (July 19, 2004 hearing tr. at 5:12-22 (Trawick)). The BOC's Director testified that Puerto Rican health officials had stopped the transfer pending their receipt of infectious disease test results on the four men. (*Id.*) However, the Director assured the Court that tests had been done, were "negative and all of [the NGRI patients] should be able to go to the facility." (*Id.* at 7:12-14 (Trawick)). Following the July 2004 hearing, the Court ordered the Government to transfer all of the NGRI patients to an appropriate forensic unit by August 19, 2004. July 21, 2004 Order ¶ 1.

18. By September 2004, the four NGRI prisoners remained at ACF, despite the fact that two of them had been medically cleared by Puerto Rican health officials. (Sept. 8, 2004 hearing tr. at 14:12-15:3 (Swan)). The Attorney General admitted that he had not considered moving the patients to either of the public hospitals in the territory. (*Id.* at 28:9-14 (Swan)). Rather, he testified that the Government was nearing completion of the new forensic facility at Anna's Hope, and that the NGRI patients would be moved there when the facility opened in November 2004. (*Id.* at 20:25-21:5 (Swan)).

19. The four NGRI patients were housed at ACF until February 2005, where they remained essentially untreated. According to their medical records, the prisoners suffered from psychosis, hallucinations, paranoia, and delusions during this time. *See, e.g.,* May 2006 Metzner Report, App. 1 at 19 (Inmate 11 suffered from delusional thinking on June 15, 2004), 21 (Inmate 12 described as seclusive and watchful on Oct. 30, 2003), 22 (Inmate 13 was observed responding to internal stimuli on August 23, 2004), and 24 (Inmate 14 suffered from auditory hallucinations and paranoia on Aug. 20, 2004).

20. On the eve of another contempt hearing, the BOC transferred the NGRI patients to the psychiatric unit at the Juan F. Luis (JFL) Hospital on St. Croix. (Feb. 15, 2005 hearing tr. at 31:5-7 (Ponteen)). The patients thrived during their stays at the hospital. On April 1, 2005, Inmate 11 was examined at ACF after being discharged from JFL hospital. According to the doctor's progress note, Inmate 11 "has significantly improved and was leading group sessions in the hospital. He is alert, pleasant, coopera-

tive. He is not psychotic and his judgment and insight are good. Will be going to court to recommend discharge for him." May 2006 Metzner Report, App. I at 19. Inmate 12 was also "seen [On April 1, 2005], one week after discharge from hospital. He is alert, oriented times three, coherent, cooperative and pleasant. He was in the JFL hospital for approximately 7 weeks and did very well. In fact, patient had begun to verbalize and socialize. Back here he has become more reticent. Awaiting completion of forensic facility for admission." *Id.* at 21; see also *id.* at 23. 24 (describing Inmate 13's and 14's responses to hospitalization).

21. Defendants moved the NGRI prisoners back to ACF without notifying either the Court or class counsel that the men had been discharged from the hospital. (Jan. 10, 2006 hearing tr. at 43:14-45:10 (Balaban and Ponteen)). The BOC Director explained in January 2006 that hospital staff had discharged the patients because they were concerned that the hospital's accreditation was jeopardized if the NGRIs remained in the psychiatric unit. (*Id.* at 45:4-10 (Ponteen)). The Director also testified that in one month the Government would complete retrofitting an empty unit next to ACF's infirmary that could house the NGRI prisoners until the forensic facility at Anna's Hope was completed. (*Id.* at 45:18-21 (Ponteen)). However, the Director acknowledged that ACF did not have a treating psychiatrist on staff. (*Id.* at 53:19-25 (Ponteen)).

22. On March 22, 2006, the Court entered the following order:

> Defendants shall move the four prisoners adjudged not guilty by reason of insanity, who have been previously identified in this case, to the psychiatric unit at the Juan Luis Hospital or the Roy L. Schneider Hospital or to both hospitals, as the case might be, until such time as the Defendants complete retrofitting and staffing an appropriate forensic unit at the Golden Grove Correctional Facility.

Mar. 22, 2006 Order ¶ 10.

23. In April 2006, Dr. Metzner interviewed the NGRI patients, and reviewed their medical records. Dr. Metzner also reviewed the December 2005 reports prepared by John Kennedy, M.D., a forensic psychiatrist hired by the Government to examine the NGRIs and determine if they had regained the capacity for judgement and control such that they were no longer a danger to themselves and others, and were entitled to be released. *See* Ex. C-F, Balaban Decl. (December 8, 2005 reports by John

Kennedy, M.D.).[3] According to Dr. Kennedy, each of the NGRI patients displayed symptoms of serious mental illness. In December 2005, guards reported that Inmate 14 was actively hallucinating. *See* Ex. C, Balaban Decl., at 2. When examined by Dr. Kennedy, Inmate 14 "presented in a bizarre fashion, speaking through clenched teeth, making poor eye contact, but repeatedly scanning the environment in an odd manner." *Id.* at 2. He also "admitted to auditory hallucinations despite being on medication." *Id.* According to occupational therapy notes, Inmate 13 "was talking to himself, had impaired concentration, and was delusional." Ex. D, Balaban Decl., at 2. On exam, Inmate 12 "was very fidgety and made poor eye contact. He had poverty of speech [and h]is mood and affect were flat." Ex. E, Balaban Decl., at 2. Inmate 11 was noted to be "delusional, rambling incoherently, and disorganized" in his medical record. Ex. F, Balaban Decl., at 2. Dr. Kennedy diagnosed each man with schizophrenia. He concluded that none of the men were eligible to be released, that three of the four were at high risk to harm themselves or others, and that each man should be transferred to a forensic facility. *See* Ex. C-F, Balaban Decl., at 3.

24. In May 2006, Dr. Metzner concluded that the patients were "receiving grossly inadequate mental health treatment." May 2006 Metzner Report at 25. Dr. Metzner found that the four men were all receiving psychotropic medications based on expired physician orders that were written more than one year ago. *See id.* App. 1 at 18-24. At least three of these men had not been seen by a psychiatrist for a year. *Id.* at 20 (Inmate 11), 22 (Inmate 12), 23 (Inmate 13). Dr. Metzner reported that "[t]he lack of any psychotropic medication monitoring by a physician is a very dangerous practice." May 2006 Metzner Report at 27. He recommended that a psychiatrist assess the NGRI patients immediately. *Id.* at 25-26. Dr. Metzner concluded that "[t]his is the only prison or jail system I know of from my 30+ years of experience with correctional health care systems where persons judged NGRI remain incarcerated for such prolonged periods of time." *Id.* at 26.

25. Dr. Metzner also toured the planned forensic unit at ACF, "which was clearly not yet completed." *Id.* at 25. The prison also had no mental health staff. Dr. Hendricks resigned in November 2005, and ACF has not had a psychiatrist for the last six months. *Id.* Also, "[t]he prison's

---

[3] All identifying information has been redacted from these reports.

social worker, who had been in charge of providing mental health services since Dr. Hendricks' resignation, has not been to work in several months." *Id.* Dr. Park, the lone physician at ACF, told Dr. Metzner that he had not seen the NGRI patients, "that the prison needed a psychiatrist, [and that he] was clearly not comfortable in providing psychiatric treatment to inmates with serious mental illnesses." *Id.*, App. I at 17-18. There were also vacancies at the prison for a mental health counselor and an occupational therapist. *Id.* at 25. Dr. Metzner concluded as follows:

> It is unlikely that the BOC will be able to recruit and hire staff to fill [the vacant mental health] positions in the near future given the unwieldy and time-consuming NOPA process, and the lack of medical leadership in the BOC. Therefore, it is likely that the four NGRI patients will continue to languish untreated in the jail.

*Id.* at 26. Dr. Metzner recommended that the NGRI patients be transferred immediately to "an appropriate mental health treatment setting." *Id.* Defendants stipulated to implementing Dr. Metzner's recommendation, which is now part of this Court's November 20, 2006 Order. *See* Nov. 20, 2006 Order ¶ 1.

26. In October 2006, Defendants reported that the four NGRI patients remained housed in a general population unit at ACF. *See* Ex. A, Declaration of Eric Balaban in Support of Findings of Fact and Conclusions of Law ["Balaban Decl. 2"] (Defendants' Responses to Plaintiffs' First Set of Interrogatories), at 9. Defendants also reported that there are still no mental health care staff at ACF who could provide treatment to these men. *Id.* at 10. Defendants did report that they contacted six maximum security forensic hospitals in March 2006 about accepting these men as patients. *Id.* at 9. However, Defendants have not contacted a single hospital in the past nine months about accepting these patients for treatment. *Id.* Also, Defendants apparently have made no effort to transfer these men back to the JFL Hospital, where they thrived while being treated in 2005.

## C. Forensic Facility

27. In 2003, this Court again found Defendants in contempt of the Referrals, Hospitalization, and Housing provisions of the Agreement. *Carty III*, slip op. at 61-62. Rather than comply with the Agreement's provisions as written, and expand services at the Roy L. Schneider

Hospital, Defendants decided to construct a forensic unit at Anna's Hope on St. Croix, and planned thereafter to transfer NGRI and seriously mentally ill prisoners there. *Carty III*, slip op. at 61. The Court found that in June 2002, "the Attorney General and the BOC Director both acknowledged the Government's responsibility to remove NGRI prisoners from the jail, and house them in an appropriate forensic facility." *Id.* at 62. The Court ordered the Defendants to devise a time line to complete the forensic unit. *Id.*

28. By November 2002, Defendants had failed to prepare a time line, and had made no substantial efforts to construct, staff, and open the unit. The BOC's Director testified that he and Dr. Hendricks had not met to discuss construction of a forensic unit, or other options for appropriately housing seriously mentally ill prisoners, since the June 4, 2002 status conference. *Id.* The bulk of Defendants' efforts had been dedicated to amending the Virgin Islands Code so that NGRI prisoners could be housed in a non-certified forensic unit, given what the Defendants deemed to be the prohibitive cost of operating a certified unit. *Id.* However, "the Director acknowledged at the hearing that the last time he spoke to the Attorney General about these legislative efforts was six to eight months before the contempt hearing." *Id.* at 62-63. Further, "[t]he Director also testified that Defendants ha[d] not developed a plan to construct a forensic unit, or convert an existing unit at the Golden Grove facility into a forensic unit, and would not do so until their effort to amend the statutory language is resolved." *Id.* at 63.

29. Through July 2004, Defendants made no efforts to construct and open a forensic facility. At a July 19, 2004 status conference, Defendants renewed their pledge to renovate the former juvenile facility at Anna's Hope for use as the forensic unit. (July 19, 2004 hearing tr. at 10:12-19 (Schrader)). Defendants stated that the building "would be operational by the end of November [2004]." (*Id.* at 10:18-19). Following the July hearing, the Court ordered the Defendants to submit by September 19, 2004 a progress report documenting their efforts to construct, staff, and open the forensic facility. July 19, 2004 Order ¶ 2.

30. The Court held another contempt hearing on September 8, 2004. The Attorney General told the Court that the Government had plans and specifications in place to build the facility, which would be akin to a "small hospital." (Sept. 8, 2004 hearing tr. at 9:21-11:5 (Swan)). The Attorney General assured the Court that the facility would be opened by

November 25, 2004. (*Id.* at 19:20-24, 20: 19-21:5 (Swan)). He testified, "[i]t will be finished for occupancy. It will be finished in terms of staffing. It will be finished in terms of who is in charge." (*Id.* at 20:5-8 (Swan)). Based on the Attorney General's representations, the Court ordered the Defendants to complete construction of the forensic facility by November 30, 2004. *See* Oct. 5, 2004 Order at 1.

31. At the hearing, the Court also reminded Defendants of its previous Order requiring them to submit by September 19, 2004 a written progress report on their efforts to open the forensic facility. The Court provided the following instruction regarding the detail it expected in the report:

> I want to know what recruitment you're undertaking to get the [facility's mental health staff]. I want to know the type of people you're trying to recruit. I want to know who is in charge of it. I want the names of the people who have actually been directed to implement the specific aspects of the plan and the move, every possible detail, as though we're planning an attack on Baghdad at that time, like a military operation. I don't just want generalities. I want specifics.

(Sept. 8, 2004 hearing tr. at 31:17-25). Despite the Court's admonition, Defendants failed to submit a progress report.

32. On February 15, 2005, BOC Director Ponteen testified that Defendants had developed a staffing plan for the facility, and were preparing a supplemental budget request to fund the new positions in the plan. (Feb. 15, 2005 hearing tr. at 28:2-10, 28:25-29:19 (Ponteen)). Director Ponteen also testified that the renovations to the physical plant would be completed by the "first week in March[, 2005.]" (*Id.* at 27:20-22 (Ponteen)).

33. In April 2005, Director Ponteen and Dr. Hendricks described to Dr. Metzner the status of the construction project. *See* April 2005 Metzner Report at 18-19. Dr. Hendricks explained that the construction would take place in two phases. In phase one, the existing buildings would be retrofitted, and a treatment building would be built. *Id.* at 18. The existing facility could not provide hospital-level care, and would not meet Joint Commission on Accreditation for Healthcare Organizations (JCAHO) standards. *Id.* Dr. Metzner recommended that the phase 1 unit serve as a step-down unit for patients who could not function in general

population units. *See id.* at 19. The second phase would involve the construction of a new building that would have an additional 30-35 beds. Dr. Hendricks stated that the BOC submitted a proposed $ 3,000,000.00 budget for the forensic facility to the Governor, but could not produce the budget during or after Dr. Metzner's site visit. *Id.*

34. Defendants had failed to hire any health care staff for the forensic facility at the time of Dr. Metzner's 2005 inspection. *Id.* Dr. Hendricks explained that he did recruit a forensic psychologist to head the treatment team for the unit, but he did not receive authorization to extend an offer to her, and she had since taken a position with the Department of Health. *Id.*

35. Dr. Metzner also toured the site of forensic unit. Despite the Attorney General's assurances that the physical plant would be completed by November 2004, Dr. Metzner found that the facility "still is far from completely renovated." *Id.* at 19. For example, the air conditioning and duct system had not been installed, there was no emergency generator, and the treatment building construction had not yet begun. The doors to the patient rooms "must be individually locked by key, which poses a substantial fire safety hazard, and violates JCAHO standards." *Id.* Dr. Metzner also found that "the rooms and shower areas were filled with hanging points that mentally ill prisoners could use to harm themselves or attempt suicide." *Id.*

36. Dr. Metzner made several recommendations regarding the Government's plan to open a forensic facility at Anna's Hope. He recommended that the BOC hire a director for the facility at least six months before it opened, so the director could hire and train key staff, and develop policies and procedures. *See id.* He also recommended that the BOC consider a contract with the Department of Health to operate the forensic facility. *See id.* at 21. Finally, Dr. Metzner recommended that the BOC either contract with a construction firm with experience building mental health treatment facilities, or hire a consultant with such experience to work with the contractor who will retrofit the existing buildings and construct the forensic facility. *See id.* at 20-21.

37. According to news reports, in the Fall 2005 the Government did request additional funds from the legislature to hire an additional 34 correctional and medical personnel to staff the forensic facility. *See* Ex. G, Balaban Decl. (Megan Poinski, "Justice Seeks Money for Corrections," *Virgin Islands Daily News*, Aug. 17, 2005, at 4). At the

January 10, 2006 hearing, Director Ponteen testified that the BOC had spoken with Dr. Denise Marshall, the director of the Mental Health Division of the Department of Health, about her interest in assisting the BOC in recruiting staff and drafting policies and procedures for the forensic facility. (Jan. 10, 2006 hearing tr. at 46:19-25 (Ponteen)). The Director conceded that the renovations to the phase one step-down unit had not been completed, and that no work had been done to construct a treatment building. (*Id.* at 49:24-50:19 (Ponteen)). The Director also acknowledged that the Defendants were in default of the Court's remedial orders, and agreed with the Court that the chronically mentally ill "should not be within the prison population. They should not be within this facility." (*Id.* at 51:16-20, 52:1-2 (Ponteen)). Following the hearing, the Court ordered the Defendants to submit by April 22, 2006 a progress report on its efforts to determine which government department would run the forensic facility. *See* March 22, 2006 Order ¶ 13. To date, Defendants have failed to submit a progress report.

38. Defendants continue to violate the Agreement and the Court's remedial orders. In April 2006, Dr. Metzner spoke with BOC Director Rosaldo Horsford about the Government's efforts to open the forensic facility since his tour one year earlier. Dr. Metzner concluded that "[t]he BOC has made little progress in the past year to open the forensic facility." May 2006 Metzner Report at 23. Since his April 2005 site visit, the BOC had done no construction at the site other than "pouring ... a concrete floor for a conference room." *Id.* at 22-23. Director Horsford also stated that he knew of no recruitment efforts to hire staff for the facility. *Id.* at 23. The Director did report that the Department of Justice had spoken with the Department of Health regarding contracting out the mental health services for this forensic unit "although Director Horsford described these discussions as very preliminary in nature and inconclusive." *Id.* The BOC did not implement Dr. Metzner's recommendation last year that it consult with an expert experienced with architectural/treatment issues for a forensic facility. *Id.*

39. In May 2006, Dr. Metzner reiterated his recommendation that the BOC should consider executing a contract with the Department of Health to operate the forensic facility under an interdepartmental contract. *Id.* He also recommended that the Government should develop a staffing plan, budget, and construction time line for the facility; and renewed his recommendation that the BOC should "hire either a

construction firm with experience building forensic facilities, or a consultant to help oversee the project." *Id.* Defendants agreed to implement Dr. Metzner's recommendations, which were incorporated into this Court's November 20, 2006 Order. *See* Nov. 20, 2006 Order ¶ 1.

40. In October 2006, Defendants reported that they had made no effort to complete a contract with the Department of Health to run the Anna's Hope facility, that they had not hired any staff for the facility, that they had not hired a construction firm, and that they had failed to develop a staffing plan, construction budget, construction time-line, or operational budget for the facility. *See* Ex. A, Balaban Decl. 2 (Defendants' Responses to Plaintiffs' First Set of Interrogatories), at 8.

## D. Jonathan Ramos

41. Jonathan Ramos is a seriously mentally ill prisoner who has been incarcerated at the CJC since April 2002 for allegedly attempting to steal a bicycle. April 2005 Metzner Report at 30. His five-year stay at the jail has been chaotic, "characterized by active psychosis, unpredictability, and dangerous behavior." *Id.* Mr. Ramos has been assaulted by and has assaulted both deputies and fellow prisoners, and he has been on constant lock-down for two years because he poses such a serious security threat. May 2006 Metzner Report, App. I at 12.

42. In October 2003 alone, Mr. Ramos was forcibly restrained after being involved in at least two violent altercations with staff. On October 9, 2003, deputies observed him "banging himself around his cell ... pulling on his cell door, cursing, and threatening." The deputies forcibly restrained Mr. Ramos. (See Dec. 3, 2003 hearing tr. at 9:7-13, Pl. Ex. 1). On October 13, Mr. Ramos got into a violent scuffle with at least seven officers at the nurse's station. Deputies placed him in handcuffs and leg irons. (See *id.*) Dr. Lu, the jail's psychiatrist, was not involved in the decision to restrain Mr. Ramos, and did not assess Mr. Ramos after either of these violent incidents. (Dec. 3, 2003 hearing tr. at 8:9-10:18 (Braslow)).[4]

---

[4] Dr. Braslow wrote the following regarding Mr. Ramos in his medical report that was filed following the hearing: "[I]nmate Jonathan Ramos [is] a psychotic with multiple episodes of abnormal and disruptive behavior. Chart notes indicate that Dr. Lu requested that the patient be admitted to the hospital psychiatric unit but the psychiatrist in the unit refused to admit the patient because he was busy and said to call back in a week. The following week there were no beds available. This patient displayed multiple subsequent

43. Dr. Braslow testified that this lack of involvement by health care staff violated both professional standards and the operating procedure for New York City jails when he was the medical director for that system. (*See id.* at 9:23-10:15 (Braslow)). He also testified that if Mr. Ramos remained housed at the jail, he could "become a danger to [himself] or to others including medical staff and correctional staff and will almost certainly continue to exhibit disruptive behavior and fail to improve psychiatrically." (*Id.* at 27:13-16 (Braslow)). Dr. Braslow stated that Mr. Ramos should be moved to a secure psychiatric facility so that he could "receive more intensive care, more close monitoring by trained mental health staff, more ensuring that [he took his] medications, and more appropriate treatment of [his] acute mental health problem." (*Id.* at 27:7-9 (Braslow)).

44. Defendants have long acknowledged that Mr. Ramos cannot safely be housed at the CJC. Leighman Lu, M.D., the jail's psychiatrist, attempted to transfer Mr. Ramos to ACF in 2003, but Dr. Hendricks refused to admit him. (*See id.* at 24:17-22 (Braslow)). After the Roy L. Schneider Hospital in St. Thomas also refused to admit Mr. Ramos in 2003, Dr. Lu sent the following plea to Attorney General Iver Stridiron:

> Presently [Mr. Ramos] is still ... ill and exhibits serious behavioral problems, hitting his head against wall, being self-destructive, actively expressing suicidal thoughts, and refus[ing] to be in the hospital. At this point he is being rejected by the hospital for both psychiatric and medical care due to [being] criminally insane and uncooperative. He is unlikely to ever regain competency and is in need of long-term residential psychiatric treatment [] stateside since there is no adequate facility available here in the U.S. Virgin Islands.

(Dec. 3, 2003 hearing tr. at 25:17-26:5, Pl. Ex. 3). Later that year, a senior corrections officer wrote the following after Mr. Ramos spit on a deputy, defecated and urinated on himself and his cell floor, and beat himself with his fists:

---

episodes of aggressive and violent behavior despite being deemed by Dr. Lu as seriously mentally ill and inappropriate for jail housing. It should also be noted that the chart mentions placing the patient in restraints on several occasions despite Dr. Lu's being unaware of any policies related to restraining mentally ill inmates." *See* Ex. B, Balaban Decl., at 11.

817

Inmate Jonathan Ramos is a security risk to himself and all BOC personnel. When you move inmate Jonathan Ramos extra security must be provided. Constant attention must be paid to keep inmate J. Ramos from hurting himself and from being hurt by others. It is a major battle to have inmate J. Ramos to take his personal hygiene; J Ramos ha[s] a practice of urinating on the cell floor, spit[ting] at officers and inmates alike. Inmate Jonathan Ramos is consuming the resources of this department manpower, medically and financially. It is my opinion that the inmate Ramos is a danger to himself, fellow inmates, and the personnel of the DOC, officers and medical staff, and Jonathan Ramos should not be housed at this facility.

(*See id.* at 23:18-24:1, Pl. Ex. 2).

45. The record in this case is littered with Defendants' broken promises regarding Mr. Ramos' care. In September 2004, Attorney General Alva Swan acknowledged that the CJC "is not a proper place" for Mr. Ramos, and testified that he would never be restored to competency in his criminal trial. (Sept. 8, 2004 hearing tr. at 35:10-11, 35:23-24 (Swan)). The Government announced that it planned to dismiss the criminal charges against him, and "have him involuntarily committed. And perhaps—or we're certain that way he will go to that long-term unit in Anna's Retreat,[5] and get his treatment there." (*Id.* at 35:19-22 (Swan)). In December 2004, Defendants' counsel Richard Schrader reiterated, "[t]he objective will be to have the involuntary commitment petition in place as a safety net upon the dismissal of the criminal charges." (*See* Feb. 15, 2005 hearing tr. at 22:18-23:5, Pl. Ex. B).

46. Despite the Attorney General's assurances, Mr. Ramos remained warehoused at the CJC. Defendants reneged on their promise to assist Angela Ramos Michael, Mr. Ramos' sister, in initiating commitment proceedings for her brother. The only help that the Government gave Ms. Ramos Michael was to mail blank commitment forms to her. (*Id.* at 19:9-25 (Ramos Michael)). Ms. Ramos Michael testified in February 2005 that she could not complete the commitment papers because they required information about Mr. Ramos' current mental health status that

---

[5] The Attorney General informed the Court that Anna's Retreat was a newly-opened chronic mental health facility on St. Thomas. (*Id.* at 36:12-20 (Swan)).

only his treating clinicians could provide. (*Id.* at 20:1-13 (Ramos Michael)). In the month before she testified, Ms. Ramos Michael had tried without success to contact Defendants' counsel Richard Schrader about the commitment papers. (*Id.* at 20:18-21:3 (Ramos Michael)). No one from the Government ever contacted Ms. Ramos Michael to offer her help. (*Id.* at 21:14-17 (Ramos Michael)). Also, neither Dr. Lu nor any representative from Department of Justice attended an interdepartmental case conference at RLS Hospital to which they were invited to "develop a long-term plan" for housing and treating Mr. Ramos. (*Id.* at 12:7-13:1 (LaPlace), Pl. Ex. A).

47. In 2005, the Government committed to moving Mr. Ramos to the forensic facility at Anna's Hope once it opened. (Feb. 15, 2005 hearing tr. at 26:9-11 (Schrader)). Director Ponteen admitted that construction at Anna's Hope had not been completed, and there was no money to recruit and hire staff for the facility. (*Id.* at 27:10-28:10, 29:11-19 (Ponteen)). In the interim, Attorney General Swan and Director Ponteen stated that Mr. Ramos would be moved in one month to a retrofitted unit at ACF that would be staffed by a physician and nurse "so that Mr. Ramos could be housed in a much better setting than he is now at the facility here on St. Thomas." (*Id.* at 38:5-25 (Ponteen), 36:5-15 (Swan)). The Attorney General stated, "[i]f we revisit this issue in a month then you can hold the Government in contempt if we haven't moved Mr. Ramos there." (*Id.* at 36:16-18 (Swan)).

48. Mr. Ramos was not moved to a retrofitted unit at ACF. He remained at the CJC when Dr. Metzner conducted his April 2005 expert inspection. By that time, Mr. Ramos had been locked down and single-celled in Cluster 3, the designated mental health unit, for nine months "due to his persistent violent behavior." April 2005 Metzner Report at 14.

49. Cluster 3 was plagued by overcrowding, partially as a result of Mr. Ramos' being single-celled. In the seven months before Dr. Metzner's 2005 site visit, "as many as four of the five cells in the cluster had held three prisoners," meaning that at least one seriously mentally ill prisoner in these double-bunk cells was forced to sleep on the cell floor. *Id.* at 14-15.

50. Despite being locked down, Mr. Ramos was still involved in a fight with a fellow prisoner and he assaulted deputies in the months leading up to Dr. Metzner's tour. See *id.* at 31 (documenting Nov. 23,

2004 and Jan. 6, 2005 assaults). Dr. Lu failed to assess Mr. Ramos after either of these fights. See *id.* During the first three months of 2005, Dr. Lu reported no improvement in Mr. Ramos' illness. "He continued to demonstrate 'sill[iness] and nonresponsiveness or gave inappropriate answers to questions. During March 8[, 2005], he answered all questions with 'I don't know.'" *Id.* Dr. Metzner agreed with Dr. Lu that Mr. Ramos "is experiencing a serious mental disorder and [is] in need of mental health treatment (*e.g.,* inpatient psychiatric hospitalization) that is not available at CJC." *Id.*

51. Shortly after Dr. Metzner's site visit, Mr. Ramos "told officers that a blue woman was bothering him and standing next to the officers. He started spitting all over the room, kicking his mattress on the floor, hitting the wall with his fist." May 2006 Metzner Report, App. I at 12. Dr. Lu did not see Mr. Ramos after this incident. Mr. Ramos has also reportedly had two more fights with fellow prisoners in the following year despite remaining locked down. *Id.* Dr. Lu did not assess Mr. Ramos after either incident. *Id.*

52. On December 8, 2005, Dr. Kennedy prepared a forensic evaluation of Mr. Ramos. Mr. Ramos refused to answer any questions during the evaluation, and appeared poised to assault Dr. Kennedy before his interview was terminated. See Ex. I, Balaban Decl. Dr. Kennedy diagnosed him with schizophrenia, paranoid type and antisocial personality disorder, and recommended that he be housed in a "maximum security forensic hospital or a psychiatric hospital designed to contain and treat highly aggressive individuals. Dr. Kennedy did not think that this inmate could be safely housed and treated at the Anna's Hope Forensic Facility." May 2006 Metzner Report, App. I at 12.

53. In January 2006, Director Ponteen acknowledged that the Defendants were in default of both the Agreement and the Court's remedial orders regarding the housing and treatment of Mr. Ramos and other seriously mentally ill prisoners. (*See* Jan. 10, 2006 hearing tr. at 51:23-52:1 (Ponteen)). He testified that the Government would send Dr. Marshall of the Division of Mental Health to tour several facilities on the mainland to identify a suitable stateside facility for Mr. Ramos. (*See id.* at 49:1-8 (Ponteen)). At the close of the hearing, the parties stipulated to the entry of an Order requiring Defendants to transfer Mr. Ramos to an appropriate psychiatric facility, either in the territory or stateside, by May 22, 2006. See Mar. 22, 2006 Order ¶ 11.

54. There are some 446 psychiatric centers and hospitals across the United States. *See* Ex. H, Balaban Decl. (National Association of State Mental Health Program Directors directory). As of January 2006, the Government had contacted only three stateside psychiatric facilities about taking Mr. Ramos: one rejected him, another the Government rejected because of its cost, and the third facility refused to consider Mr. Ramos "because [the Government] owe[s] them, they're not willing to do any additional business with us." (*Id.* at 49:14-16 (Ponteen)). Defendants contacted seven more psychiatric centers about taking Mr. Ramos in March 2006, the same month this Court ordered the Defendants to transfer him to a stateside facility. *See* Ex. A, Balaban Decl. 2 (Defendants' Responses to Plaintiffs' First Set of Interrogatories), at 9. In the last nine months, Defendants have not contacted a single one of the some 440 remaining stateside psychiatric facilities about accepting Mr. Ramos as a patient. *Id.*

55. Mr. Ramos remains housed at the CJC. Dr. Lu has noted no improvement in Mr. Ramos' condition in the past year. In April 2006, Mr. Ramos "had a 'bizarre flat affect [and] poor eye contact[, i]nappropriate demeanor[, his] speech [was] minimal[, and he gave] irrelevant answers." *Id.* In May 2006, Dr. Metzner again found that Mr. Ramos "suffers from a chronic schizophrenic disorder, which requires treatment in a long-term hospital setting." *Id.* Mr. Ramos did not even recognize his sister the last time she saw him. Declaration of Angela Ramos Michael (dkt. 462) ¶ 7.

56. In June 2006, without notifying either the Court or class counsel, Attorney General Drue ordered her department to dismiss the criminal charges against Jonathan Ramos. This was less than a week after Plaintiffs had filed the pending motion to hold Attorney General Drue and the other named defendants in contempt of the Court's March 22, 2006 Order requiring them to transfer Mr. Ramos to a psychiatric hospital.

57. The Court held an emergency hearing regarding Mr. Ramos on June 23, 2006. The Attorney General told this Court that the Department of Justice had prepared a petition to have Mr. Ramos committed on an emergency basis at RLS Hospital, and that he would be transported from the CJC to the hospital that day. The Attorney General conceded that she had not spoken with the hospital or the Department of Health about the commitment petition or Mr. Ramos, and that she had no assurance that

the hospital would accept Mr. Ramos. (June 23, 2006 hearing tr. at 34:16-35:2, 42:17-18, 48:4-16, 51:12-13 (Drue)). She also conceded that the emergency commitment would last for a maximum of five days. (*Id.* at 46:1-15 (Drue)). She was unaware of any plan the Government had to house and treat Mr. Ramos after the five day commitment order—if granted—expired. (June 23, 2006 hearing tr. at 34:16-35:2, 42:17-18, 48:4-16, 51:12-13 (Drue)). She also said that she would have no authority over Mr. Ramos once his criminal charges were dismissed on the Government's motion, and that she did not have the authority to order the hospital to accept Mr. Ramos. (*Id.*)

58. On June 23, 2006, CJC staff took Mr. Ramos to RLS Hospital, and attempted to have him admitted under the emergency commitment statute of the Virgin Islands. Ramos Michael Decl. ¶ 8. Dr. Lu had completed an emergency commitment petition on behalf of Mr. Ramos. *Id.* RLS Hospital refused to accept Mr. Ramos. *Id.*

59. Following the June 23, 2006 hearing, this Court ordered the Defendants to file a motion to modify the March 22 Order, which they did on June 27, 2006. See Defendants' Motion to Modify the Court's March 22, 2006 Order ["Motion to Vacate"] (dkt. 456). In their Motion, Defendants have asked this Court to relieve them entirely of their obligation under the Order to hospitalize Mr. Ramos, and "[r]elease Jonathan Ramos to the care of his legal guardian, within the oversight and jurisdiction of the Superior Court (formerly known as the Territorial Court) of the Virgin Islands." *Id.* at 5.

60. In support of their Motion, Defendants notified the Court in August 2006 that Jose Ramos, Mr. Ramos' half-brother, had filed a petition for guardianship before the Superior Court of the Virgin Islands. *See* Informative Notice (dkt. 469). Defendants noted that Jose Ramos stated in his petition that "he would like the opportunity to care [for] and obtain medical care for his brother." *Id.* at 1 (internal quotation marks omitted).

61. Defendants failed to notify this Court that in September 2006, Jose Ramos was identified as a convicted felon in the proceedings before the Superior Court, and that his petition for guardianship was denied. *See* Ex. B, Balaban Decl. 2 (Reply to Response to Petition, filed Sept. 22, 2006, in *In the Matter of the Guardianship of Jonathan Ramos. Jr.,* Case No. ST-06-GU-27 (V.I. 2006)). Rather, the Superior Court ordered Arturo Watlington, Jr., the attorney who represents the estate of Mr.

Ramos' late father, to submit the names of two attorneys who may be considered for guardianship of Mr. Ramos. Ex. C, Balaban Decl. 2 at 2 (*In the Matter of the Guardianship of Jonathan Ramos, Jr.*, Case No. ST-06-GU-27, slip op. (V.I. Oct. 24, 2006)).

62. In its October 24 Order, the Superior Court also denied a request to have a guardian appointed to "care for [Jonathan Ramos] or locate a residential treatment program to care for Jonathan Ramos," on the grounds that "the issue of placement of Jonathan Ramos is pending in Civil No. 94-078 in the District Court of the Virgin Islands, a Court of competent jurisdiction." *Id.* at 3. Defendants failed to notify this Court about this Order, even though it was served upon Attorney General Drue, Mr. Schrader, and territorial warden Agnes George. *Id.*

63. Mr. Ramos remains warehoused at the CJC, even though there are no criminal charges pending against him. The risk Mr. Ramos poses to himself and others would be magnified if he were released to the streets of St. Thomas, where he would have no home, no supervision, and would likely no longer be taking his medications. Mr. Ramos has been institutionalized since he was thirteen years old. *See* Declaration of Angela Ramos Michael ¶ 2. According to his sister, Mr. Ramos has on several occasions assaulted his family members who have attempted to care for him. *Id.* ¶¶ 2-5. Mr. Ramos assaulted his sister one day after she took him into her home after he was discharged from the Seaview juvenile facility at age 14. *Id.* ¶ 2. At age 18, Mr. Ramos attempted to assault his brother and sister-in-law on the day they took him into their home after he was discharged from a Georgia juvenile facility. *Id.* ¶ 4. Mr. Ramos had been housed at the Georgia facility since his arrest for assaulting a home health care nurse whom the Ramos family had hired to care for him—the nurse called police after she barricaded herself in a closet to escape Mr. Ramos. *Id.* ¶ 3.

64. In the month leading up to his arrest that had him at the CJC, Mr. Ramos was living on the streets, unmedicated, refusing offers of help from his family. *Id.* ¶ 5. Shortly before his arrest, Mr. Ramos reportedly got into a scuffle, and was almost drowned. *Id.* Due to the severity of his illness and his violent history, no family member would take Mr. Ramos if he were released. *Id.* ¶¶ 2, 9.

## E. CJC Annex & Medical Staff

65. In 1997, Defendants signed a Cooperative Agreement Program (CAP) Agreement with the U.S. Marshal's Service to house federal detainees in BOC facilities in exchange for a per diem payment for each detainee, and $1,329,00.00 to renovate the Annex so that detainees could be housed there. *Carty II*, 144 F. Supp. 2d at 412. In 1999, two disbursements totaling approximately $1,000,000.00 were issued to the Government from the CAP Agreement for Annex renovations. *Id.* at 412-13.

66. Despite this influx of funds, Defendants failed to complete renovations to the Annex. The Government hired a private firm, F & G Construction, to renovate the Annex, but the project was plagued by work stoppages caused by the Defendants' failure to pay F & G. *Id.* at 413. Based on the long-standing delays in completing the Annex renovations, and the resulting environmental hazards, this Court on August 2, 2000 ordered the Defendants to complete the renovations by November 1, 2000. *See* Sept. 7, 2000 Order ¶ 3.

67. In 2001, this Court held the Defendants in contempt of the Annex renovation provision of the September 7, 2000 remedial order. *Carty II*, 144 F. Supp. 2d at 412-13, 416-17. This Court found that "delays in renovations allowed dangerous conditions at the Annex to persist, and the unfinished construction created its own hazards," and created the risk "of [Defendants'] being held in breach of the Marshal's Service CAP agreement, which would lead to a substantial loss of revenue and threaten Defendants' ability to comply with the Agreement and the Court's orders." *Id.* at 413-14.

68. In 2003, the Court again held Defendants in contempt of the Annex renovation provision. It found that the Government had failed to monitor F & G's work throughout 2001 "despite their avowed poor working relationship with the firm." *Carty III*, slip op. at 40. By the time the Government cancelled its contract with F & G, the Annex was plagued by "structural deficiencies," including "water intrusion that likely would damage the building's electrical system." *Id.* at 38 (internal quotations omitted). Before the Annex prisoners were moved out of the building in 2002, they had to endure "hazardous and unsanitary conditions," including sewage and water flowing into their cells, inoperable toilets, and bug and rodent infestation. *Id.* at 39, n.42.

69. The Annex remained closed when the Court issued its May 2003 contempt decision, "despite [Defendants'] assurances that the renovation project would be 'fast-tracked' and completed by November 2002." *Id.* at 40.

70. In 2003, the Government executed a contract with Roy's Construction Co. to complete the Annex renovations. (See Dec. 3, 2003 hearing tr. at 44:14-25 (Stridiron)). The Attorney General testified that the project would be completed by March 2, 2004. (*Id.* at 45:5-8 (Stridiron)). Defendants later submitted to counsel and the Court a punch list for completing the Annex renovations, which had a projected completion date of April 8, 2004. *See* Ex. J, Balaban Decl. In July 2004, Defendants reported that the construction project had not been completed, and that they now expected the work to be done, and the building re-occupied, by October 2004. (July 19, 2004 hearing tr. at 23:18-24:12 (George)). Warden George assured the Court that the Government could return prisoners to the Annex as soon as it "got a permit from the Department of Public Works that [the Annex] can be re-occupied." (*Id.* at 24:5-7 (George)). The Court ordered the Defendants to complete the Annex and return prisoners there no later than October 31, 2004. *See* July 21, 2004 Order ¶ 3. At a September 8, 2004 hearing, the Defendants assured the Court that they were on schedule to re-open the Annex no later than October 30, 2004. (Sept. 8, 2004 hearing tr. at 51:11-15 (Williams)).

71. Defendants failed to meet the Court's deadline. On December 21, 2004, James Balsamo, an environmental and fire safety expert, toured the Annex construction site. No work was ongoing at the site at the time of his inspection. (See Feb. 15, 2005 hearing tr. at 46:5-22, Pl. Ex. D at 23). Mr. Balsamo spoke with the general contractor from Roy's Construction, who told him that the company had worked several months without a signed contract. (*See* Feb. 15, 2005 hearing tr., Pl. Ex. D at 23). He explained that "the company ceased work in the Fall after the Government failed to pay its bills for the work. The contractor estimated that the company had done 'several hundred thousand dollars' of work before stopping due to non-payment." (*Id.*) The contractor stated that Roy's and the Government were negotiating for the payment of earnest money, so that work could resume. (*Id.*)

72. After some further delays, the Annex renovations were completed at the end of 2005. However, the Defendants failed to hire

health care staff for the Annex. (*See* Jan. 10, 2006 hearing tr. at 10:11-12 (LaPlace)). Defendants planned for existing health care staff working at the CJC to travel to the Annex and provide services. (*Id.* at 11:3-13 (LaPlace)). However, Lisa LaPlace, R.N., the BOC's Nursing Coordinator, testified that this solution was "unacceptable [since t]he staff is already stretched as far as it can stretch." (*Id.* at 11:11-13 (LaPlace)). On Nov. 21, 2005, Ms. LaPlace submitted to the Director a list of health care positions that were needed to serve the prisoners at the Annex. (*See id.* at Pl. Ex. A). Ms. LaPlace testified that Defendants would need two part-time R.N.'s and a part-time M.D. at the facility. (*Id.* at 11:15-16 (LaPlace)). Ms. LaPlace has identified candidates for these positions who are ready to begin work. (Jan 10, 2006 hearing tr. at 11:23-12:2 (LaPlace)). However, as of January 2006, Defendants had failed to submit a supplemental budget to the legislature to fund these positions. (*Id.* at 16:1-3 (Ponteen)).

73. Despite her requests, Ms. LaPlace was not given access to the Annex until she accompanied the Court on its January 10, 2006 inspection. (*Id.* at 13:8-12 (LaPlace)). Following her tour, Ms. LaPlace testified that the Annex does not have medical equipment necessary to provide health care services, or a set of health care policies. (*Id.* at 13:16-22 (LaPlace)). Following the hearing, the Court ordered the Defendants to hire a physician and two nurses for the Annex, and by March 29, 2006 to produce a progress report on their efforts to draft policies and purchase medical equipment for the Annex. Mar. 22, 2006 Order ¶¶ 1-3.

74. Defendants have failed to hire a full complement of medical staff or produce a progress report. Dr. Metzner reported in May 2006 that the Annex remained closed "because the BOC has failed to hire health care personnel to staff the facility, and has not installed necessary medical equipment." May 2006 Metzner Report at 2. CJC staff told Dr. Metzner that mentally ill prisoners would be excluded from the Annex, but the BOC "has not developed policies and procedures to assess, identify, and exclude mentally ill inmates from the facility." *Id.* Dr. Metzner recommended that Defendants develop policies and procedures that "describe the screening process to be used to identify and exclude mentally ill inmates from the Annex[, and that] describe the process to be implemented that identify and transfer inmates who were appropriately admitted to the Annex but later demonstrate symptoms of a mental illness." *Id.* at 3. Defendants agreed to implement Dr. Metzner's

recommendation, which was incorporated into this Court's November 20, 2006 Order. *See* Nov. 20. 2006 Order ¶ 1.

75. In August 2006, Plaintiffs filed their First Set of Interrogatories. Among the information they requested was the following: "Identify all persons who provide health care services to CJC Annex prisoners, and the date(s) they began their work at the Annex, the number of hours of service they provide at the CJC Annex, and the number of hours of service they provide at the CJC (if any)." Ex. A, Balaban Decl. 2 (Defendants' Responses to Plaintiffs' First Set of Interrogatories), at 2. Defendants failed to list any health care personnel working at the Annex in their October 2006 response. *Id.* Defendants also failed to list any draft and completed health care policies and procedures for the Annex in response to Plaintiffs' interrogatories. *See id.* at 4.

76. Despite not having medical staff or health care policies and procedures, the Defendants nevertheless re-opened the Annex in May 2006. The facility does not house any federal detainees, and only houses sentenced Virgin Islands prisoners. See *id.* at 2. Though the Annex has a capacity of 80 prisoners (Jan. 10, 2006 hearing tr. at 10:21-22 (LaPlace)), the average daily population at the Annex since it re-opened is 18 inmates. Ex. A, Balaban Decl. 2 (Defendants' Responses to Plaintiffs' First Set of Interrogatories), at 2.

77. In November 2006, Defendants reported that they had hired a part-time RN to work at the Annex. *See* Ex. D, Balaban Decl. 2 (Nov. 6, 2006 memorandum from Lisa LaPlace Knight, RN, to Director Horsford), at 2. Defendants did not indicate the status of the unfilled physician and second RN positions. *See id.* Also, at that time the Annex still was not equipped with an adequate medical office to treat prisoners. *Id.* Among the deficiencies noted were "[n]o garbage can, no privacy screen, no water source, fire hydrant hung where inmate may use as a weapon, exam table missing part and torn fabric to cover[,] [b]uilt in cabinet not where requested and no consultation with territorial coordinator as for the reason for the need to change from requested placement." *Id.* Ms. LaPlace suggested that there be "monthly meetings to develop policies for the Annex." *Id.* She concluded the memo as follows, "It is not clear as to what type of client will be housed at [the Annex], and the procedure to have patients seen at CJC by Dr. Less[, the jail's physician]." *Id.*

827

78. As a result of Defendants' failure to repopulate the Annex, they have been unable to house federal detainees on St. Thomas,[6] thus losing valuable revenue from the CAP Agreement that otherwise could have been used to remedy the numerous dangerous conditions at the jail.

### F. Medical Records & Health Care Records Clerk

79. The Medical Charts provisions of the Settlement Agreement require Defendants to adopt standard charting procedures so that prisoners' medical records are complete and usable. *See* Agreement ¶¶ N. 1-4. Through 2004, Dr. Braslow reported that the CJC maintained mental health records in separate charts that were kept in a different office from prisoners' medical records. *See, e.g.,* Ex. B, Balaban Decl., at 9. Dr. Braslow found that "[t]his results in considerable confusion in trying to review and monitor patient care." He recommended that "[t]he medical and mental health records ... be maintained in a unified chart, but may be kept in separate sections within that chart in order to protect confidentiality." *Id.*

80. In April 2005, Dr. Metzner found the record system unchanged. He reported that "[s]ignificant problems exist related to the current health care record system because the jail maintains multiple health care records for the same inmate, and does not have medical records staff to organize and maintain the files." Metzner April 2005 Report at 12. Dr. Metzner found that "[i]t is extremely difficult to document and assess a specific inmate's course of treatment with the current disorganized records system." *Id.* At the close of Dr. Metzner's tour, Defendants agreed to integrate health care records into a single chart for each prisoner. *Id.*

81. As of January 10, 2006, Defendants had failed to integrate the medical and mental health records, or to hire additional staff to maintain those records. (*See* Jan. 10, 2006 hearing tr. at 23:21-24:5. (LaPlace)). Rather, Ms. LaPlace, as the jail's chief nurse, handled all medical record filing, but she did not have access to the mental health files. (*Id.* at 24:1-11 (LaPlace)). Following the hearing, the Court ordered the Defendants to hire a health care records clerk. Mar. 22, 2006 Order ¶ 5.

---

[6] The BOC's Director testified in 2002 that the Annex renovations will result in an additional 24 or 25 beds to house federal detainees. (Nov. 7, 2002 hearing tr. at 91:10-17 (Magras)).

82. Defendants are violating the Court's Order and the Settlement Agreement's Medical Charts provisions. In May 2006, Dr. Metzner again found that the jail maintained separate medical and mental health care records. Metzner May 2006 Report at 14-15. He did report that the jail had assigned a corrections officer to the medical department to work as a records clerk. *Id.* at 15. Dr Metzner concluded, "[t]hough such an assignment attempts to provide a much-needed function, the use of a correctional officer for such purposes violates national standards (including those of the National Commission on Correctional Health Care (NCCHC)) related to issues of confidentiality and medical autonomy. In addition, a correctional officer, no matter how well intentioned, does not have the training or experience required for a medical records filing position." *Id.* Two months before Dr. Metzner's tour, Plaintiffs had objected to the Defendants' plan to hire a deputy to act as a records clerk, had sent the relevant NCCHC standard to Defendants, and asked them to reconsider. *See* Ex. K, Balaban Decl. (Feb. 17, 2005 letter from Eric Balaban to Richard Schrader, Jr.). Defendants disregarded Plaintiffs' request.

83. In May 2006, Dr. Metzner recommended that the BOC fund a medical records technician position for CJC health care. May 2006 Metzner Report at 15. Defendants agreed to implement this recommendation, which was incorporated into this Court's November 20, 2006 Order. *See* Nov. 20, 2006 Order ¶ 1. Rather than hire a qualified medical records technician, the Defendants are using Department of Labor trainees to assist medical staff with prisoners' health care records. *See* Ex. A, Balaban Decl. 2 (Defendants' Responses to Plaintiffs' First Set of Interrogatories), at 5. As of October 2006, only 40% of prisoners' medical and mental health records had been integrated. *Id.*

## II. CONCLUSIONS OF LAW

### A. There is Clear and Convincing Evidence that Defendants are in Contempt of Both the Agreement and the Court's Remedial Orders.

1. A court has the "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Willfulness is not an element of civil contempt, and

good faith is not a defense. *See Robin Woods, Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994); *Harley Davidson, Inc. v. Morris*, 19 F.3d 142, 148-49 (3d Cir. 1994). In order to hold Defendants in contempt, this Court must find by clear and convincing evidence that (1) a valid order existed, (2) the defendant had knowledge of the order,[7] and (3) the defendant disobeyed the order. *See Harris v. City of Philadelphia*, 47 F.3d 1311, 1326 (3d Cir. 1995) [*"Harris I"*].[8]

2. Defendants, however, "may escape contempt by showing that [they] could not possibly comply with the court's order, despite making all reasonable efforts to do so." *Harris v. City of Philadelphia*, 47 F.3d 1333, 1341 (3d Cir. 1995) [*"Harris II"*]. The Third Circuit has held that the defense of impossibility refers to "physical impossibility beyond the control of the alleged contemnor." *Allegheny County Jail Inmates v. Wecht*, 874 F.2d 147, 152 (3d Cir.), vacated and remanded on other grounds, 493 U.S . 948 (1989), remanded with instructions to vacate as moot. 893 F.2d 33 (3d Cir. 1990); *see also Halderman v. Pennhurst State School & Hospital*, 673 F.2d 628, 638 (3d Cir. 1982) (only "literal physical impossibility" excuses compliance); *cf. United States v. City of Yonkers*, 856 F.2d 444, 458 (2d Cir. 1988) (City held in contempt of civil rights housing decree for failing to pass court-ordered housing ordinance; impossibility claim rejected because City did not ask Governor to use his authority to remove from office the recalcitrant city council members who refused to pass the ordinance); *cert. granted in part sub nom, Spallone v. United States*, 489 U.S. 1064 (1989); *rev'd*, 493 U.S. 265 (1990) (reversing contempt sanction against city council members).

3. To preclude a finding of contempt, Defendants bear the burden to produce "evidence beyond a mere assertion of inability [to comply], and to show that [they] ha[ve] made in good faith all reasonable efforts to comply." *Harris I*, 47 F.3d at 1324: see also *Carty III*, 144 F. Supp. 2d at 415 ("[m]ere good faith efforts are insufficient" to escape contempt) (citing *Robin Woods, Inc.*, 28 F.3d at 399 and *Harley Davidson*, 19 F.3d

---

[7] A corollary to the requirement that the contemnor have knowledge of the order is that the order must be specific and definite *See Harris v. City of Philadelphia*, 47 F.3d 1342, 1349, 1350 (3d Cir. 1995).

[8] The Court's contempt power is unaffected by the Prison Litigation Reform Act, 18 U.S.C. § 3626 *et seq.* (2000). *See Carty III*, slip op. at 63 n.83 (citing *Essex County Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 445, 462 (D.N.J. 1998) and *Harris v. City of Philadelphia*, 2000 WL 1978 at *16 (E.D. Pa. Dec. 23, 1999)).

at 148-49). If a defendant "offers no evidence as to [his] inability to comply with the [ ] order, or stands mute, [he] does not meet [his burden]. Nor does he do so by evidence or by his own denials which the court finds incredible in context." *Maggio v. Zeitz*, 333 U.S. 56, 75-76 (1948).

4. Defendants are in contempt of the Agreement and the Court's March 22, 2006, October 5, 2004, and July 19, 2004 Orders. It is undisputed that the Agreement and remedial orders were and still are valid; they are not presently challenged by either party. It is likewise undisputed that Defendants had knowledge of their obligations under the Agreement and remedial orders, which are explicit and unambiguous. As set forth in the foregoing factual findings, there is clear, convincing, and undisputed evidence that Defendants have willfully disobeyed numerous provisions of the Agreement and remedial orders.

5. For the most part, the Court's findings are based on Dr. Metzner's reports, to which the Defendants have stipulated, and on Defendants' own admissions at previous hearings. In many cases, Defendants conceded during these hearings that they failed to comply with the Court's Orders.

6. Over the past three years, Defendants have also failed to live up to the commitments they made to this Court to remedy conditions at the jail. For example, since 2003 Defendants missed no fewer than four separate deadlines they pledged to meet for re-opening the Annex. They failed to assist Mr. Ramos' sister in preparing civil commitment papers, and did not move Mr. Ramos to either Anna's Retreat or to a retrofitted unit at ACF, as they variously promised to do over the past three years. Defendants have made virtually no progress in completing the forensic facility at Anna's Hope, despite assuring the Court that they would open the facility no later than November 2004. They acknowledge that the four NGRI patients remain virtually untreated in a general population unit at ACF.

7. The efforts Defendants have made to comply with this Court's Orders leave much to be desired. They contacted less than 2% of all psychiatric hospitals in the Untied States to find an appropriate facility for Mr. Ramos and the NGRI patients, and have not contacted a single facility in close to a year. While they removed corrections officers from handling medical records, they replaced them with Department of Labor trainees who pose the same confidentiality hazards as the officers

831

themselves. They did hire one part-time nurse to provide services at the Annex. However, their own staffing plan calls for the hiring of a second nurse and a physician, who apparently have not begun work at the facility. Also, the Annex still has no health care policies and procedures, and its medical area is ill-equipped. Defendants acknowledge they have made no effort in the past year to complete the forensic facility at Anna's Hope. As a result, prisoners like Mr. Ramos and the four NGRI patients will continue to languish in the territory's prison and jail. Certainly, these half-measures do not amount to "all reasonable efforts" to comply.

8. Defendants have attributed their non-compliance with the remedial order requiring Jonathan Ramos to be transferred to insufficient funds. The Court repeatedly has held that "'lack of financing is not a defense to the failure ... to provide minimum constitutional standards in the operation of a ... jail.'" *Carty III*, 144 F. Supp. 2d at 416 (quoting *Carty I*, 957 F. Supp. at 744-45); *see also Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392 (1992) ("financial constraints cannot be used to justify the creation or perpetuation of constitutional violations."). Defendants are obligated to consider all reasonable options to comply with these provisions, regardless of how costly or politically unattractive they may be. *See Harris I*, 47 F.3d at 1324 (the fact that the City might incur additional costs by conducting a court-ordered facilities audit which may later require an amendment did not render the City's performance of the audit impossible so as to relieve them of the responsibility for compliance); *Twelve John Does v. District of Columbia*, 855 F.2d 874, 877-78 (D.C. Cir. 1988) (rejecting District's claim of impossibility to comply with population cap in consent decree; political difficulties associated with the acquisition of additional facilities or other actions designed to accommodate the overflow did not establish that the District was powerless to alleviate overcrowding so as to excuse disobedience, and contempt sanction is upheld). Moreover, at least one facility they contacted—St. Elizabeth's Hospital in Washington, D.C.— refused to consider taking Mr. Ramos because the Government had an outstanding unpaid bill for services from that facility.

9. This Court has recognized the financial barriers to compliance faced by Defendants, and created a remedial account in order to provide Defendants with ready access to funds necessary to improve conditions and operations at the jail. Even if the funds in the remedial account did not cover the entire cost of constructing a forensic unit, they could have

832

been used to pay for the temporary transfer of Mr. Ramos and the NGRI patients to a stateside forensic unit, or to increase mental health services at the CJC, until Defendants develop a concrete plan for appropriately housing and treating these prisoners in the territory. The funds in the account could have covered the costs of hiring medical staff for and equipping the Annex until the supplemental budget was approved. Defendants, however, took none of these steps. Such conduct exposes them to contempt. *See, e.g., Inmates of Allegheny County Jail*, 874 F.2d at 152 (county officials who "simply chose to take no steps to provide the Warden and his staff with the wherewithal to comply" with consent order held in contempt; impossibility defense dismissed as "sophistical").

10. Defendants have moved this Court to vacate its March 22, 2006 Order to hospitalize Jonathan Ramos. This Court addresses Defendants' Motion as follows:

## 1. Defendants Are Not Entitled to Vacatur of this Court's Order Requiring Them to Hospitalize Jonathan Ramos.

11. Rather than comply with the Court's Order to hospitalize Mr. Ramos, Attorney General Drue attempted to subvert it by dismissing the criminal charges against him, and discharging him from the CJC. The Attorney General took these steps without notifying either this Court or Plaintiffs' counsel, or filing a motion to modify the Court's Order. When it learned of the Attorney General's actions, this Court ordered the Defendants to file a motion to modify, which they did on June 27, 2006. *See* Motion to Vacate (dkt. 456).

12. In their Motion, Defendants have asked this Court to relieve them entirely of their obligation under the Order to hospitalize Mr. Ramos, and "[r]elease Jonathan Ramos to the care of his legal guardian, within the oversight and jurisdiction of the Superior Court of the Virgin Islands." *Id.* at 5. However, the Superior Court presiding over Mr. Ramos' guardianship proceedings dismissed a request to have a guardian appointed to "care for him or locate a residential treatment program to care for Jonathan Ramos," on the grounds that "the issue of placement of Jonathan Ramos is pending in Civil No. 94-078 in the District Court of the Virgin Islands, a Court of competent jurisdiction." Ex. C, Balaban Decl. 2 at 3 (*In the Matter of the Guardianship of Jonathan Ramos, Jr.*, Case No. ST-06-GU-27, slip op. (V.I. Oct. 24, 2006)). Therefore, there is no longer a basis for Defendants to seek a vacatur or modification of this

833

Court's March 22, 2006 Order. Defendants failed to notify this Court about this Order, even though it was served upon Attorney General Drue, Mr. Schrader, and territorial warden Agnes George. *Id.*

13. Defendants would not be entitled to vacatur even if the Superior Court had not dismissed the guardianship petition. To obtain a complete dissolution of all or part of a consent decree, a moving party must show it has complied with the decree for a reasonable period of time such that the purpose of the decree has been achieved, and that there is little likelihood that the wrongs the decree were designed to address will recur. *See Bd. of Ed. of Oklahoma City Public Schools v. Powell*, 498 U.S. 237, 248 (1991) (a federal court may vacate an equitable decree "after the [defendants] have operated in compliance with it for a reasonable period of time."); *see generally* 12 MOORE'S FEDERAL PRACTICE, § 60.47[2][c] (3d ed. 2003) ("a modification of an injunction may be justified on a wide variety of circumstances. ... In contrast, if a party seeks to have a decree set aside entirely, he or she has to show that the decree has served its purpose, and there is no longer any need for the injunction.").

14. Defendants are not entitled to vacatur. They concede that they have not complied with the March 22 Order, and that Mr. Ramos remains warehoused at the jail. In fact, Defendants have made no effort to hospitalize Mr. Ramos in the past nine months, other than their failed attempt to commit him to RLS Hospital, which has rejected Mr. Ramos in the past, and is not an appropriate facility for him, according to the jail's own psychiatrist. (*See* Pl. Ex. 3, Dec. 3, 2003 hearing ("[Mr. Ramos] is unlikely to ever regain competency and is in need of long-term residential psychiatric treatment [ ] stateside since there is no adequate facility available here in the U.S. Virgin Islands.")). Certainly, their ill-conceived, failed effort to transfer Mr. Ramos to RLS Hospital cannot warrant vacatur. *Cf. Powell*, 498 U.S. at 249-50 (holding that a school district that had "complied ... in good faith" with a desegregation decree for thirteen years **might** be entitled to termination, if it had "complied in good faith with the desegregation decree since it was entered," and "the vestiges of past discrimination [have] been eliminated to the extent practicable.") (footnote omitted) (emphasis added).

## 2. Defendants are not Entitled to a Modification of This Court's Order.

15. In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), the Supreme Court set forth the considerations relevant to a request to modify a consent decree under FED. R. CIV. P. 60(b)(5):

> Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgement should have prospective application," not when it is no longer convenient to live within the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances.

> A party seeking modification of a consent decree may meet its initial burden by showing either a significant change in factual conditions or in law.

*Id.* at 383 (footnote omitted).

16. A party alleging that a change in law warrants modification must show either that the decree imposes an obligation that has become impermissible under federal law, or that the law has changed to make legal what the decree was designed to prohibit. *Id.* at 388. A party alleging a change in fact must show that this change makes compliance with the decree substantially more onerous; or it makes the decree unworkable because of unforeseen obstacles; or it makes enforcement of the unmodified decree detrimental to the public interest. *Id.* at 384. However, "modification should not be granted when a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* The Third Circuit has emphasized, "[c]entral to the court's consideration will be whether the modification is sought because changed conditions **unforeseen by the parties** have made compliance substantially more onerous or have made the decree unworkable." *Building and Constr. Trades Council of Philadelphia v. NLRB*, 64 F.3d 880, 888 (3d Cir. 1995) (emphasis added).

17. Defendants have not argued that there has been an intervening change in law since the Court entered its Order three months ago. They

do argue that there have been two changes in fact that require modification. Neither alleged change in fact requires this Court to modify its Order that Defendants hospitalize Mr. Ramos.

18. First, Defendants argue that the Virgin Islands superior court judge presiding over a probate action regarding the estate of Mr. Ramos' father "recently ordered counsel for the Estate of Juan Ramos (Jonathan Ramos' father) to file [a] proof of guardianship petition for Jonathan Ramos in the Family Division of the Court by June 30, 2006." Motion to Vacate at 3.

19. Again, Defendants failed to notify this Court that the Superior Court has dismissed a request to have a guardian appointed to "care for him or locate a residential treatment program to care for Jonathan Ramos," and has referred "the issue of placement of Jonathan Ramos" to this Court. Ex. C, Balaban Decl. 2 at 3 (*In the Matter of the Guardianship of Jonathan Ramos, Jr.*, Case No. ST-06-GU-27, slip op. (V.I. Oct. 24, 2006)).

20. Therefore, the future appointment of a guardian for Mr. Ramos will not address his placement or care. That issue has been left for this Court. The appointment of a guardian to protect Mr. Ramos' interest in the pending probate proceedings over his father's estate does not make Defendant's compliance with the Order to hospitalize him "more onerous," nor would it create an "unforseen obstacle" that would make compliance "unworkable," nor would it make compliance "detrimental to the public interest." *See Rufo*, 502 U.S. at 384. Certainly, the guardian's duty to protect Mr. Ramos' best interests is also served if Defendants meet their obligation to hospitalize him. One would expect that Mr. Ramos' guardian, once appointed, would strongly support the Government's complying with the Court's Order.[9]

21. It is Defendants' refusal to comply with the Order that has been "detrimental to the public interest." Three psychiatrists, two of whom work for the Government, have all agreed that Mr. Ramos poses a serious threat to harm himself and others, and that there is no facility in the territory that can adequately house and treat him. The public's

---

[9] In fact, Arturo Watlington, who represents the Ramos family in the probate action, filed a motion to have himself or another attorney appointed to serve as Mr. Ramos' guardian. Declaration of Arturo Watlington (dkt. 462) ¶ 5. Mr. Watlington states that he would oppose any modification of this Court's Order if he were appointed Mr. Ramos' guardian. *Id.* ¶ 7.

interest in seeing that Mr. Ramos is not released until he no longer poses a danger to himself and others can only be served if the Government is required to comply with the Court's Order, and transfers Mr. Ramos to an appropriate facility, either in the territory or stateside.

22. Second, Defendants ask that they be relieved of their responsibility to hospitalize Mr. Ramos because he "is no longer a part of the plaintiff class due to the recent dismissal of his criminal charges." Motion to Vacate at 5. This Court has already determined that Defendants' "canceling the charges or withdrawing the [criminal] charges no way changes the effect of [its] Order." (June 23, 2006 hearing tr. at 53:8-10). Likewise, the Supreme Court made clear in Rufo that "modification should not be granted when a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 384. Here, Defendants seek modification based upon a deliberate action they themselves took, not a development hat was unknowable to them last year when they stipulated to the Court's Order. Far from being unanticipated, this was a tack Defendants proposed in 2005, for which the Court rebuffed them:

> MR. SWAN: I've just been informed of something that we have tried before, or we have talked about before but certainly wouldn't work in a humanitarian—in a humanitarian manner. We can easily go and dismiss the case against Mr.Ramos.
>
> THE COURT: That's not the answer.
>
> MR. SWAN: You'd have to do it but that's not the answer. And we simply have to find a place for him—just plain old humanitarian reasons.

(Feb. 15, 2005 hearing tr. at 37:10-19).

23. In essence, the Attorney General's argument is that she can subvert this Court's Order by exercising her authority and discretion under Virgin Islands law to dismiss the criminal charges against Mr. Ramos. The Supreme Court rejected such willful defiance in *Cooper v. Aaron*, 358 U.S. 1 (1958). In *Cooper*, the state of Arkansas amended its constitution to command the state's attorney general to oppose the "unconstitutional decisions" of the Supreme Court with regard to school desegregation. The legislature also passed statutes establishing barriers to integration, and Governor Faubus ordered the state's National Guard to

block court-ordered integration of Central High School in Little Rock. *Id.* at 12. A unanimous Court ruled that legislature's and Governor's actions did not excuse compliance with the integration orders:

> No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it. Chief Justice Marshall spoke for a unanimous Court in saying that: "If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the Constitution itself becomes a solemn mockery. ..." A Governor who asserts a power to nullify a federal court order is similarly restrained. If he had such power, said Chief Justice Hughes, in 1932, also for a unanimous Court, 'it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases ... .'

358 U.S. at 18-19 (internal quotation marks and citations omitted).

24. Since *Cooper*, the federal courts repeatedly have struck down similar efforts by state officials to nullify their responsibilities under court-ordered consent decrees. *See, e.g., Harris v. City of Philadelphia*, 47 F.3d 1333, 1340, 1342 (3d Cir. 1995) (Third Circuit rejected defendants' claimed "complete defense to contempt" of court order requiring 90% occupancy at residential drug treatment facilities because under state law they "must rely on parole petitions to individual state courts to fill a drug treatment facility with prison inmates, and these courts [were] refusing such petitions." The court held, "[b]ecause the City directly contributed to the state courts' loss of confidence in [the treatment facility], it cannot now complain that its hands were tied by the state courts' refusal to cooperate."); *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 n.20 (9th Cir. 1992) ("When the defendants chose to consent to a judgment, rather than have the District Court adjudicate the merits of the plaintiffs' claims, the result was a fully enforceable federal judgment that overrides any conflicting state law or state court order. The strong policy encouraging settlement of cases requires that the terms of a consent judgment ... be respected as fully as a judgment entered after trial."); *Hook v. State of Arizona*, 907 F. Supp. 1326, 1342 (D. Ariz. 1995) (in denying a motion to modify a prison conditions consent decree

838

premised on an alleged change in state law precluding payment of special master, the court held," [e]ssentially, the Defendants suggest that the legislature of the State of Arizona be given the power to require a federal court to modify or 'harmonize' its orders to comply with the Arizona state law. ... Even the Congress of the United States lacks the power which the Arizona state legislature would enrobe itself."); *Halderman v. Pennhurst State School and Hosp.*, 533 F. Supp. 631, 638-39 (E.D. Pa. 1981) (in finding Pennsylvania legislators in contempt of a court order appointing a special master in a special education case, the court held that the defendants were not relieved of their responsibility to comply with the order because the legislature refused to appropriate funds to pay the master); *cf. Good v. Dauphin Co. Social Services*, 891 F.2d 1087, 1091 (3d Cir. 1989) ("[S]tate law cannot immunize government employees from liability resulting from their violations of federal law.").

25. There are no grounds to distinguish Governor Faubus' actions in Cooper to thwart enforcement of a school desegregation order from Attorney General Drue's willful decision to dismiss the criminal charges against Jonathan Ramos, and then use that dismissal as grounds to thwart enforcement of this Court's order to hospitalize him. In both cases, state officials used their powers under state law in contravention of an order of the federal court. Allowing this naked breach of the Supremacy Clause would only encourage additional attempts by Defendants to defy this Court's power. The risk is particularly great for prisoners like Mr. Ramos, whose treatment needs outstrip the Government's current capacity. Apparently, it is far easier and less costly for the Government simply to dismiss the charges against Mr. Ramos than to do its duty to house and treat him.

### 3. All of the Equities in this Case Support Enforcement of the Court's Order to Hospitalize Mr. Ramos.

26. As the *Rufo* Court stated, "a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Rufo*, 502 U.S. at 391. This Circuit has recognized that *Rufo* does not establish a "universal formula," and has set forth factors that a court should consider when deciding whether to modify an injunction, including:

the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; the length of time since entry of the injunction; whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; and the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction.

*Building and Const. Trades*, 64 F.3d at 888.

27. Here, equity requires this Court to maintain its March 22, 2006 Order, which was designed to bring an end to Defendants' mistreatment and neglect of Mr. Ramos. The Order is based on substantial evidence, including the testimony by three psychiatric experts who all agree that Mr. Ramos poses a serious threat to harm himself and others, and cannot be adequately treated in the territory. The Court was compelled to enter the Order after four years of Defendants' broken promises regarding Mr. Ramos' care. The Order was entered less than a year ago, and was based on the consent of the Defendants. Since the Order was entered, Defendants have made little or no effort to comply with its terms and hospitalize Mr. Ramos. By their own admission, in the past nine months they have not contacted a single stateside psychiatric center about accepting Mr. Ramos as a patient. As a result, Mr. Ramos remains warehoused at the CJC, where Defendants have long acknowledged he cannot be safely and appropriately treated.

28. This is the second time that Defendants have sought to modify a decree in this case. In 1997, this Court denied Defendants' motion to modify the compliance deadlines in the Settlement Agreement that was premised on "unforeseeable and unbudgeted financial setbacks caused by extreme inclement weather storms." *Carty I*, 957 F. Supp. at 746. This Court reasoned that equitable considerations did not support modification since Defendants' compliance with the Agreement had been "marginal at best," the CJC remained an "[in]humane prison [that] does not provide minimal constitutional living conditions," and "there is no evidence to suggest that defendants have even attempted to effect systemic change by advocating for legislative assistance and support." *Id.*

29. These same equitable considerations for denying modification nine years ago still apply today. Defendants' record of compliance with the Agreement and the Court's remedial orders remains abysmal. Defendants have now been held in contempt four times in this case, and

they remain under two contempt citations. Their mistreatment of Mr. Ramos is well-documented: they have allowed him to languish in the jail for close to five years, despite the pleas from their own psychiatrist to hospitalize him for his own safety, and for the safety of fellow prisoners and staff. Defendants have contacted only 10 of the 446 psychiatric facilities in the United States regarding Mr. Ramos. The BOC's director admitted that one of these hospitals had done business with the Virgin Islands in the past, but it refused to consider taking Mr. Ramos because the Government had failed to pay its bills. At the last status conference, the Attorney General conceded she had not spoken with either the Governor or the Secretary for the Department of Health regarding Mr. Ramos.

30. Defendants' claim that Mr. Ramos will be transferred to an appropriate treatment facility as a result of the as-yet unfiled commitment proceedings by an as-yet unnamed guardian is divorced from reality. Last year, Defendants themselves tried and failed to have Mr. Ramos involuntarily committed under the territory's emergency commitment statute. Even if Mr. Ramos were committed, there is no facility in the territory that is appropriate to treat him. In fact, this Court has held Defendants in contempt three times for failing to hospitalize acutely and chronically mentally ill prisoners. It was Defendants' long-acknowledged non-compliance that prompted this Court to order the Government to construct and open a forensic facility in the territory to house and treat seriously mentally ill prisoners, including Mr. Ramos. *See* Oct. 5, 2004 Order at 1.

31. The only appeal to equity Defendants make in support of their motion is to argue that this Court's Order does not provide an appropriate deference to the independent power of the territory to fashion and implement an involuntary commitment procedure, and therefore the Order is not narrowly tailored to address their acknowledged violation of Mr. Ramos' constitutional rights. Motion to Vacate at 5. The Supreme Court has made it clear that local government administrators are entitled to "no deference" when they seek to "establish[] that a significant change in circumstances warrants modification of a consent decree." *Rufo*, 502 U.S. at 392 n.14. If the Defendants here were entitled to the deference they demand, then every prison consent decree would be voidable by administrators from inception at their will, whether or not government officials were able to satisfy their burden under *Rufo*.

32. Moreover, the Superior Court has already dismissed a guardianship petition to locate a treatment program for Mr. Ramos, citing this Court's March 22 Order and these proceedings. Therefore, the issue of Mr. Ramos' care rests squarely with this Court. Even if a guardian were appointed for Mr. Ramos to initiate commitment proceedings that result in an order, that order must yield to the hospitalization order entered by this Court. See *Harris v. City of Philadelphia*, 1995 WL 527383 (E.D. Pa. Aug. 17, 1995). In *Harris*, the city of Philadelphia asked the court to modify the non-admission and release provision of a consent decree addressing unconstitutional conditions in the Philadelphia jail system, since judicial commitment orders required the jail to accept prisoners. *Id.* at *1. The court denied the City's motion, rejecting the argument "that the Supremacy Clause of the United States Constitution does not require that state commitment order[s] yield to the federal consent decrees because there never has been a trial in this action." *Id.* at *3.

33. If anything, Defendants' argument here is weaker than the City's argument that was rejected in *Harris*. Here the Court's hospitalization order was not based solely on the parties' consent,[10] but rather was the

---

[10] To the extent the Court's Order was based on the parties' consent, Defendants should be estopped from arguing now that the Order goes too far. Typically, courts consider three factors in determining whether to apply judicial estoppel. First, "a party's later position must be 'clearly inconsistent' with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001). Here, Defendants agreed two months ago that the provision requiring them to hospitalize Mr. Ramos was the least intrusive means to correct their violation of Mr. Ramos' federal rights. *See* March. 22, 2006 Order at 4. Now they argue that "[r]eleasing Mr. Ramos to the care of his legal guardian, within the oversight of the Superior Court of the Virgin Islands will be the least intrusive and most appropriate means of assuring the Jonathan Ramos receives the proper care and treatment he needs." Motion to Vacate at 5.

Second, the court must have accepted the party's earlier position. *Id.* at 751-52. Here, the Court had to adopt the language Defendants agreed to in order to comply with the requirements for imposition of relief of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a) (2002). Third, the party seeking to assert an inconsistent position must "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 752. Here, Defendants if not estopped would no longer be required to hospitalize Jonathan Ramos, or take any action on his behalf, despite their documented and acknowledged neglect of Mr. Ramos in the past four years. Mr. Ramos' fate would then be decided by an as-yet unfiled commitment petition, to be filed by an as-yet unnamed guardian. Given the fact that no hospital in the territory will accept him, Mr. Ramos would possibly end up on the streets, untreated, a man the Government's own psychiatrist

result of numerous evidentiary hearings regarding Mr. Ramos held over the past four years. Three psychiatrists, two of whom work for Defendants, have all agreed that Mr. Ramos needs to be transferred to a type of facility that does not exist in the territory. Defendants are asking this Court to wipe clean their record of broken promises and mistreatment of Mr. Ramos, and to ignore the recommendations of their own experts, all for the sake of allowing a future commitment proceeding to commence that would yield the same result this Court has already reached.

34. Defendants do not argue that the Court's Order impinges on their ability to manage the CJC, or on their involuntary commitment process. The Court's Order does not bar Defendants from using procedures under territorial law to hospitalize Mr. Ramos. However, a party may not enter a consent judgment to resolve hard-fought litigation after specific findings of unconstitutional practices and then—with no allegation of changed circumstances or adverse impact on its operations-turn around and disavow that judgement. Indeed, Defendants' motion could have been made one day after the Order was entered. Rule 60 requires Defendants to satisfy this Court that there has been a fundamental and unforeseen change of circumstances such that Defendants' obligation to hospitalize Mr. Ramos is no longer equitable. Defendants have failed to do so.[11]

## B. The Court Shall Stay Imposition of Contempt Sanctions.

35. "[T]he law affords courts great and sound discretion in fashioning an appropriate sanction for contempt." *Carty v. Schneider*, 986 F. Supp. 933, 939 (D.V.I. 1997); *see also Elkin v. Fauver*, 969 F.2d

---

deemed to be "at high risk in the reasonable future to be dangerous to himself or others if discharged into the community." Ex. I, Balaban Decl. (December 8, 2005 forensic report regarding Inmate Jonathan Ramos by John Kennedy, M.D.) at 3.

[11] Finally, Defendants' claim that they are entitled to relief from the Court's Order as a matter of general equity under FED. R. CIV. P. 60(b)(6) is equally unavailing. Rule 60(b)(6) allows a party to seek relief from a judgement for "any other reason justifying relief." This Circuit has long held that Rule 60(b)(6) "is available only in cases evidencing extraordinary circumstances ... and only when the relief sought upon any other reason than a reason which would warrant relief under 60(b)(1-5)." *Stradley v. Cortez*, 518 F.2d 488, 493 (3d Cir. 1975) (internal citation and quotation marks omitted). Here, Rule 60(b)(6) is inapplicable since Defendants have sought relief under Rule 60(b)(5).

48, 52 (3d Cir. 1992). A court may impose fines following a contempt finding. These fines may "seek to compensate the complainants ... for damages caused by past acts of disobedience." *Carty II*, 986 F. Supp. at 939 n.12 (citing *Latrobe Steel Co. v. United Steelworkers of America*, 545 F.2d 1336, 1344 (3d Cir. 1976)); *see also Elkin*, 969 F.2d at 52. "Alternatively, the court may exercise its equitable power and order that the sanction be used to remedy the problems underlying the contempt finding." *Carty*, 986 F. Supp. at 939 n.12 (citing *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421 (1986)). A court may also impose coercive contempt sanctions, which are prospective fines intended to spur the contemnors into obedience by penalizing them for future violations of lawful orders. *Harris I*, 47 F.3d at 1328. "Coercive sanctions ... are conditional in that the contemnor must be permitted to avoid them by adhering to the court order." *Carty II*, 144 F. Supp. 2d at 418. Finally, "the court may also require the contemnor to perform affirmative acts, even acts not required by the initial consent decree." *Carty I*, 957 F. Supp. at 747 (citing *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1150, 1159 (3d Cir. 1982)).

■ 36. "The contempt power and the discretion to impose sanctions ... have limits." *Carty*, 986 F. Supp. at 939. The Supreme Court has cautioned that "in selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Spallone*, 493 U.S. at 276 (internal quotations omitted); *see also Inmates of the Allegheny County Jail v. Wecht*, 901 F.2d 1191, 1198 (3d Cir. 1990) (same). A compensatory sanction must not exceed the actual damages incurred by the injured party, and must be based on evidence of that party's actual loss. *Elkin*, 969 F.2d at 52. There must be a nexus between any affirmative acts ordered as a contempt sanction and the contumacious conduct. *See Harris I*, 47 F.3d at 1331 (reversing district court's sanction of dismissal of City's motion to modify as insufficiently related to the City's contemptuous acts). Moreover, the amount of coercive contempt sanctions depends upon "the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. UMW*, 330 U.S. 258, 304 (1947).

37. In the context of prison litigation, courts have imposed substantial coercive and compensatory fines for failure to comply with orders to remedy prison overcrowding and unconstitutional conditions of

confinement. *See, e.g., Alberti v. Klevenhagen*, 46 F.3d 1347, 1360 (5th Cir. 1995) ($50.00 daily coercive contempt fines for each inmate over population cap upheld in prison conditions case); *Harris II*, 47 F.3d at 1342 ($125,000.00 fine); *Essex County Jail Inmates v. Amato*, 726 F. Supp. 539, 550 (D.N.J. 1989) (fines in excess of $3,000,000.00 for violations of population and exercise provisions). Courts have also required the contemnor to perform affirmative acts to assure compliance with court orders, such as providing early release to prisoners to meet court-ordered population caps, or expunging disciplinary proceedings that did not comply with an existing decree. *See Powell v. Ward*, 643 F.2d 924, 933 (2d Cir. 1981) (expungement); *Inmates of Allegheny Jail v. Wecht*, 573 F. Supp. 454, 457-58 (W.D.Pa. 1983) (early release).

## 1. Coercive Contempt Sanctions

38. A coercive contempt sanction is the least power adequate to spur Defendants to comply with the provisions of the Agreement and remedial orders. Defendants have defied this Court's orders during the long history of this case, and, as a result, conditions at the jail still are hazardous. The prospect of Defendants' continued disobedience threatens the very lives and safety of prisoners and staff alike.

39. This Court has already found Defendants in contempt three times in this case, and declined to enter coercive sanctions each time, with the hope and expectation that Defendants would remedy the many hazardous conditions at the jail. The Court has repeatedly warned Defendants that they faced contempt sanctions if they did not comply, and even provided Defendants with grace periods with firm deadlines for final compliance with the Agreement. The Court also ordered the creation of a remedial account so that Defendants could bypass the normal budgetary process and have ready access to funds necessary to make improvements to operations and conditions at the CJC and Annex. Throughout this case, the Court has also ordered the Defendants to produce progress reports and updates on their efforts to comply with the Agreement and remedial orders.

40. None of these efforts has coerced Defendants to comply. This Court must therefore conclude that coercive contempt sanctions are the only available option, and that the prospect of daily fines finally will lead to improvements in conditions that were first mandated by this Court some twelve years ago.

41. This month **John deJongh** took office as the Governor of the U.S. Virgin Islands. He has named Vincent Frazier as his Attorney General designee. Under Federal Rule 25(d)(1), Governor deJongh is automatically substituted as a named defendant in this action, as will be Attorney General-designee Frazier upon confirmation, and, as will be the BOC director whom the Governor chooses to appoint. The fact that these officials were not involved in the acts and omissions that have led this Court to hold the Government in contempt does not immunize them from being the subject of contempt sanctions. These officials are bound by the requirements of the Agreement, and this Court's remedial orders. They will ultimately be responsible for ensuring the Defendants' compliance, and are obligated to meet all of the commitments made by their predecessors during this case, and must suffer the consequences of the Government's past failures.

42. However, the Court is mindful that a new administration has recently been elected in the Virgin Islands, and that Governor de Jongh must be given the opportunity to succeed where his four predecessors have failed; namely, in bringing the Bureau of Correction, the CJC, the CJC Annex, and the Anna's Hope forensic facility into compliance with the Agreement, this Court's remedial orders, and constitutional standards.

43. This Court therefore concludes that it will stay the imposition of contempt sanctions at this time to allow the parties to meet to discuss the status of this case. This Court shall retain the option of imposing sanctions—upon motion by Plaintiffs or *sua sponte*—should the new administration fail to demonstrate in short order real demonstrable progress towards compliance. To this end, this Court will order the Defendants to produce in sixty days a comprehensive progress report documenting their efforts to comply with the provisions of the Settlement Agreement and this Court's remedial orders with which they have been held in contempt. The Court's staying of contempt sanctions shall have no effect on the Court's consideration or disposition of Plaintiffs' Motion for Appointment of a Temporary Health Care Receiver (dkt. 454), which has been fully briefed and is awaiting a decision.

### Conclusion

For the foregoing reasons, this Court holds Defendants in contempt of the following provisions of the Settlement Agreement and this Court's

remedial orders: A. <u>Settlement Agreement</u> provisions IV.N. 1-4. (medical charts); B. <u>March 22, 2006 Order</u> provisions 1 (Annex medical staff), 3 (health care staffing progress report), 5 (health care records clerk), 10 (NGRI transfers), 11 (Jonathan Ramos transfer); C. <u>October 5, 2004 Order</u> (construction of the forensic unit); and D. <u>July 19, 2004 Order</u> provisions 1 (NGRI transfers), 2 (forensic facility), and 3 (completion and reopening of the Annex). An appropriate Order follows. The Order also sets forth the manner in which the Court will resolve the matter of contempt sanctions.